# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| RAMONA D. HAWKINS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-00121-SLC |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| *sued as Nancy A. Berryhill,* | ) | |
| *Acting Commissioner of SSA,*[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Ramona D. Hawkins appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[2] (*See* DE 1). For the following reasons, the Commissioner's decision will be

REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in

accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Hawkins applied for DIB in August 2011, and she filed for SSI in November 2013,

initially alleging disability as of May 15, 2008 (DE 10 Administrative Record ("AR") 21).

Hawkins later amended her alleged onset date to December 31, 2009. (AR 173). Hawkins's DIB

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, — F.3d —, 2017 WL 398309 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

claim was denied initially on November 29, 2011, and was again denied upon reconsideration on April 9, 2012. (AR 21, 97-99, 107). Hawkins filed a request for a hearing before an Administrative Law Judge (AR 110), at which point Hawkins's SSI claim was associated with her DIB claim, and both claims were escalated to the hearing level (AR 21). Administrative Law Judge William Pierson ("the ALJ") held a hearing on August 22, 2013, at which Hawkins was represented by counsel. (AR 42). On December 18, 2013, the ALJ issued an unfavorable decision, finding that Hawkins was not disabled because she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (AR 34-35). Hawkins requested the Appeals Council review the ALJ's decision (AR 16), and the Appeals Council denied her request, making the ALJ's decision the final, appealable decision of the Commissioner (AR 1-4).

Hawkins filed a complaint with this Court on May 19, 2015, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Hawkins alleges that the ALJ erred by: (1) improperly discounting the opinions of treating psychiatric nurse Karen Lothamer and psychiatrist Larry Lambertson; (2) improperly evaluating the opinion of Dr. Kenneth Bundza; (3) improperly discounting the credibility of Hawkins's symptom testimony; and (4) improperly finding that Hawkins did not meet the durational requirements for a severe mental impairment. (DE 19 at 10-16).

## II. FACTUAL BACKGROUND[3]

### A. Background

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 573-page administrative record necessary to the decision.

At the time of the ALJ's decision, Hawkins was 49 years old. (AR 47). She completed high school and has some college education. (AR 50). Her employment history includes work as a residential counselor working with the mentally ill, work as a public assistance caseworker, work in group homes to assist mentally handicapped individuals, work cleaning office buildings, work as a medical records clerk, and some work babysitting. (AR 51-62).

### B. Hawkins's Testimony at the Hearing

At the hearing, Hawkins testified that she was single and lived alone in a rental home, which she was able to pay for with assistance from the township for her rent and utilities. (AR 48). Hawkins also gets food stamp benefits, but her applications for Medicaid have been repeatedly denied. (AR 48-49). Most recently prior to the hearing, she had been denied Medicaid in July 2013. (AR 49). Hawkins has no other income. (AR 49). Hawkins is five feet, two inches tall and weighs 230 pounds, although her weight fluctuates depending on her medications and her pain level. (AR 47-48). She drives an automatic car occasionally if she is not in pain, in order to get to appointments if she cannot get anyone else to take her. (AR 49-50).

From 1996 until 2000, Hawkins worked at the Fort Wayne State Developmental Center as a residential counselor for mentally ill individuals. (AR 51). As part of that job, she assisted mentally ill clients with their daily living skills. (AR 51). From 2000 to 2004, she worked as a public assistance caseworker for the Allen County Division of Family Resources, where she processed applications for public assistance, Medicaid, food stamps, and Hoosier Health Wise. (AR 51). After that, Hawkins worked part-time with ARC Easter Seals. (AR 53). She also started cleaning office buildings part-time with Enviro Clean and at Park Center in 2004. (AR

3

53-54).  In January 2005, Hawkins got a job working full-time as a medical records clerk at Park

Center.  (AR 53-54).  Hawkins resigned from her job at Park Center in 2007 because she wanted

to go back to school, and her supervisor there would not work with her school schedule.  (AR 53-

54).  She did not end up going back to school and instead obtained full-time work at ARC.  (AR

56).  Her work with ARC continued until 2008, when she was terminated. (AR 55-56).  She was

terminated by ARC after her back surgery, because she was in so much pain that she could no

longer do the work.  (AR 56-57).  In 2009, Hawkins was self employed as a babysitter, working

three days a week to take care of two infants.  (AR 57-62).  While her taxes were originally filed

showing income from babysitting in 2010, that was due to an error by her tax preparer, and her

taxes have since been amended to show that she had no income in 2010.  (AR 61-62).  Hawkins's

counsel amended her onset date at the hearing to the date suggested by Social Security,

December 31, 2009.  (AR 62).

     Hawkins explained that her pain is what keeps her from working; her pain is worst in her

tail bone area, but she also has pain in her shoulders and neck, the base of her head, and her

thighs.  (AR 63).  The pain in her tail bone is always there for the most part, but it is aggravated

by sitting.  (AR 64).  Her tail bone pain ranges from a five or six to a 10 on a 10-point scale, and

she has gone to the emergency room due to the pain.  (AR 64).  The pain in her shoulders occurs

all day, but gets worse at night.  (AR 65).  The pain in her shoulders ranges from a three to a 10

on a 10-point scale, with the worst pain occurring at night.  (AR 65).  While she has had X-rays

on her shoulder, her doctors have not been able to find anything that is causing her pain.  (AR

87).  The pain in her neck and head is a "nagging little pain" that occurs "all day everyday," but

which is not as intense as the pain in her shoulder and back. (AR 65). The pain in her neck and head ranges from a two to a five on a 10-point scale. (AR 66). Her neck and head pain had only recently started, during the three months before the hearing, and she had not talked to any of her doctors about her head and neck pain. (AR 86-87). Hawkins's pain in her legs is sharp, stabbing pain, which feels like a spasm. (AR 66). The pain in her legs goes all the way down to her heels sometimes, and her pain is aggravated by standing. (AR 66-67).

Hawkins explained that she has been on Vicodin and naproxen, and she takes ibuprofen daily. (AR 67). The ibuprofen takes most of the pressure off in her legs, but not her other areas of pain. (AR 67-68). The Vicodin and naproxen make her drowsy. (AR 68). Hawkins does not have a continuous prescription for Vicodin; she only takes it when she goes to the emergency room. (AR 68). The Matthew 25 clinic gives her naproxen, which she takes twice a day. (AR 68-69). The naproxen that she takes in the morning makes her drowsy about an hour after she takes it, so she sleeps for at least two and a half hours. (AR 69). Hawkins also uses a heating pad everyday to help with the pain, and she uses icy hot mainly at night. (AR 70). Hawkins had surgery on her lower back, and she also went to physical therapy for two to three months after surgery, but the physical therapy did not help her. (AR 70). The TENS unit that she used during physical therapy also did not help. (AR 71). Hawkins was given a walker after her back surgery, and she uses it about three times a week when her pain makes it so that she cannot straighten up. (AR 89-90). Prior to the surgery, Hawkins had some injections and nerve blocks; the first one helped her a lot, but the second one did not help at all. (AR 71-72). She also had two cortisone shots in each shoulder after her surgery; the first set of shots in 2010 helped for about a year

before the pain came back, but the second set of shots did not help at all.  (AR 72).  The shoulder

injections were provided to her by the orthopedic clinic through Matthew 25.  (AR 85).  After the

first set of shots, her shoulder pain completely went away, but it came back in 2012.  (AR 85-86).

Hawkins's severe pain causes her to have problems staying asleep, since the pain wakes

her up.  (AR 72).  She only sleeps between an hour and 45 minutes to three and a half hours

during the night.  (AR 73).  Her lack of sleep causes her problems functioning during the day

because she is tired and irritated.  (AR 73-74).

Hawkins estimated that the heaviest thing she could lift and carry would be a gallon of

milk.  (AR 74).  The longest she could stand before she needed to change positions would be four

to six minutes.  (AR 74).  At that point, she would need to sit down because of the pain in her

legs.  (AR 74-75).  On a good day, she has given herself a shower and has stood in the kitchen to

make a sandwich.  (AR 75).  On a good day, she has walked a half a block; when she walks from

the car to the door of the grocery store, she starts hurting.  (AR 75).  On a good day, she can sit

for 30 to 35 minutes.  (AR 76).  Hawkins has difficulty standing up again after she has been

sitting; she has to scoot to the edge of the chair, then rock herself up, and then stand for 30 to 45

seconds before she starts walking a little bit; after four or six minutes, she has to sit back down.

(AR 76-77).  She does not have problems using her fingers, but she cannot lift her arms above

her head because of her shoulders.  (AR 77-78).

Hawkins also has some mental health problems, which she is getting treatment for at Park

Center.  (AR 78).  Her problems include her isolation, her nightmares, her depression, and her

post-traumatic stress disorder ("PTSD").  (AR 79).  Because of her depression, she does not go

out unless she has to; her friend makes her go out sometimes to try to get her to do things like she used to do. (AR 79-80). She no longer goes out dancing. (AR 81). Her depression began after her son died in 1999, and it got worse after her back surgery. (AR 88). Hawkins only went to seek treatment for her depression the year before the hearing; she delayed in seeking help because she did not want to be on antidepressants anymore, since they make her gain weight and make her tired; she thought that she could handle it on her own. (AR 88-89). The medication that Karen Lothamer prescribed for her has helped with the severity of her nightmares. (AR 81). Her nightmares started after a traumatic event in September 2012. (AR 81). Hawkins believes that her mental health problems affect her ability to work because she is very isolated, in a lot of pain, and has a lot of sleep problems, so that there is "no way [she] can function at a job effectively." (AR 82).

In discussing her daily activities, Hawkins talked about the day before the hearing. (AR 82). She woke up at 4:30 in the morning, and she just sat in bed and cried. (AR 82-83). Then she went and made coffee at 5:00 or 5:15. (AR 83). She drank a cup of coffee while sitting on her sofa and watching television. (AR 83). She watched television for about two and a half hours, during which time she was "up and down" because she was hurting. (AR 83). Around 7:00 or 7:30, she fell asleep for about 45 minutes. (AR 83). She woke up when her friend called her to check on her. (AR 83). After the phone call, Hawkins went to her bedroom and laid down because she was hurting, but she did not sleep. (AR 83). Then she took her naproxen and laid in bed until 10:00. (AR 83). After the naproxen kicked in, she slept until noon, after which she lay in bed reading for about an hour. (AR 83). After she stopped reading, she just laid in bed until

about 4:00, when her friend came over. (AR 84). Hawkins did not have anything to eat that day until her friend came over because she was not hungry. (AR 84). Her friend made her some fruit, which she ate even though she was not hungry. (AR 84). Hawkins sat and talked with her friend until about 5:30 or 6:00, when her friend left. (AR 84). After that, she went back to bed around 6:30 or 7:00, after having taken her naproxen at about 5:30. (AR 84). Hawkins described the day before the hearing as a "bad day." (AR 85). She usually has at least three bad days per week. (AR 85).

### C. The VE's Testimony at the Hearing

The VE testified that she had reviewed the record regarding Hawkins's vocational background. (AR 91). She explained that she would testify in line with the *Dictionary of Occupational Titles* ("*DOT*"), and that she would advise of any conflicts and the basis for any opinion in conflict with the *DOT*. (AR 91). The VE stated that based on the record and the testimony during the hearing, Hawkins had past work as a teacher for the mentally impaired, as an intake worker, as a group home worker, as a janitor, as a medical records clerk, as an office manager, and as a babysitter. (AR 92-94). The VE explained that employers typically require employees to stay on task for 80% to 85% of a workday, which takes into consideration customary breaks (two 15-minute breaks and a half hour for lunch) as well as an additional two to five minutes per hour, or 3% to 8% off task per hour. (AR 94). Employers typically tolerate employees being absent between one and three days per month; if an employee consistently missed three or more days a month, that employee would not be able to maintain competitive employment. (AR 94).

The ALJ only asked the VE a couple of questions during the hearing because there were some records that they were waiting on. (AR 91). The ALJ then held the record open and directed the VE to provide Hawkins's counsel with assistance if requested. (AR 95).

### D. Summary of the Relevant Medical Evidence

On September 25, 2008, Hawkins was seen by Dr. Robert Shugart at Fort Wayne Orthopaedics regarding a workers' compensation claim. (AR 342). Hawkins complained of back pain and pain in both her thighs, and she stated that her pain was due to an injury she received while lifting a patient as part of her job at ARC Easter Seals on May 2, 2008. (AR 342). Dr. Shugart reviewed Hawkins's MRI, which showed a central disc at L5-S1, with some modic changes of degeneration. (AR 343). Dr. Shugart discussed surgical options with Hawkins, specifically the possibility of a simpler discectomy instead of a fusion. (AR 343). Dr. Shugart referred Hawkins for an EMG. (AR 343).

Hawkins returned to Fort Wayne Orthopaedics on December 2, 2008, for an appointment Dr. Kevin Rahn. (AR 339-40). Dr. Rahn noted that in Dr. Shugart's absence, he would be performing Hawkins's surgery on the following Friday. (AR 339). On December 23, 2008, Hawkins had a post-surgical followup appointment at Fort Wayne Orthopaedics with Dr. Shugart, two and a half weeks after her surgery. (AR 338). Hawkins reported still having some left hip and thigh pain. (AR 338). Dr. Shugart removed her staples, started her in physical therapy, provided her with a temporary handicap parking sticker for three months, and instructed her to return for a followup appointment in four or five weeks. (AR 338). Dr. Shugart told Hawkins that she could return to work on January 5, 2009, in a light duty capacity, with

restrictions of lifting no more than five pounds, no bending, and no climbing. (AR 338).

On April 14, 2009, Dr. Shugart saw Hawkins again for a final followup appointment at four and a half months post-surgery. (AR 334). He stated that "[s]he is better," although she "still notices some left buttocks pain." (AR 334). Dr. Shugart noted that the X-rays "show apparent good fusion," and that Hawkins was at maximal medical improvement, although she had "not really made significant progress." (AR 334). After a functional capacity evaluation, Dr. Shugart wrote that Hawkins's restrictions were: "[o]ccasional lifting 15 pounds, frequent lifting 10 pounds, frequent bending, occasional climbing, occasional kneeling, frequent squatting, sit-to-stand option 30 minute intervals with no pushing or pulling over 15 pounds." (AR 334). Dr. Shugart stated that these were permanent restrictions. (AR 334).

On March 19, 2010, Hawkins underwent a sleep study at Parkview Hospital's Sleep Disorders Center after being referred by the Matthew 25 Clinic. (AR 501-03). The polysomnography report was prepared by Dr. Jeffrey Walker on March 31, 2010, who diagnosed Hawkins with mild obstructive sleep apnea syndrome, with a respiratory disturbance index of eight episodes per hour of sleep and oxygen desaturation down to 86%. (AR 499).

On May 11, 2011, Hawkins was seen at the Matthew 25 Clinic for a followup appointment. (AR 518). While her physician noted that the sleep study had shown mild obstructive sleep apnea, he noted that no CPAP was indicated, and he recommended that Hawkins begin a weight loss regimen. (AR 518). On August 5, 2011, Hawkins returned to the Matthew 25 Clinic for complaints of chronic shoulder pain, nicotine addiction, and insomnia. (AR 514). Her nurse practitioner referred her for physical therapy to help with her shoulder pain

and also prescribed naproxen. (AR 514). Regarding her nicotine addiction, it was noted that Hawkins had stopped smoking as of May 8th, and that she was completing her 12-week period of Chantix, without any side effects. (AR 514). Hawkins was also prescribed Amitriptyline for her insomnia. (AR 514).

On September 7, 2011, Hawkins returned to the Matthew 25 Clinic for complaints of shoulder pain. (AR 512). She received 80 mg injections of Kenalog in her left shoulder. (AR 512). Hawkins attended her next appointment at the Matthew 25 Clinic on October 5, 2011, reporting complaints of mild obstructive sleep apnea, insomnia, left shoulder pain, and excessive fatigue. (AR 508). Her healthcare provider again noted that a CPAP was not indicated for her sleep apnea. (AR 508). Regarding her insomnia, her provider observed that the Amitriptyline was not effective, so it was discontinued. (AR 508). Hawkins reported that she was taking a two-hour nap during the day. (AR 508). As to her shoulder pain, her provider noted that she had received the Kenalog injections, and she had another appointment on October 13th. (AR 508). Her physical exam that day was normal, although her provider documented an abnormality regarding Hawkins's psychiatric system. (AR 507).

Hawkins underwent a myoview perfusion study at Parkview Hospital on October 14, 2011, upon referral from the Matthew 25 Clinic. (AR 372-94). Although the test was stopped due to Hawkins's request, because she reported having chest pain, the study physician, Dr. Ronald J. Landin, opined that Hawkins's nuclear perfusion scan was normal in both stress and rest, and that there was no evidence for stress-induced ischemia or myocardial scarring. (AR 372).

On November 3, 2011, Hawkins reported to Dr. H.M. Bacchus, Jr., for a physical consultative exam at the request of Social Security.  (AR 348-51).  Upon physical exam, Dr. Bacchus noted that Hawkins was overweight but in no acute distress; was alert, oriented, and cooperative; had tenderness to palpation and range of motion in her lumbosacral spine, with positive leg raises on both sides; that her gait was slow and antalgic; that she walked without any assistive device; that she was unable to walk on her heels or toes, or hop; that her tandem gait was unsteady at times; that she could squat 1/3 of the way down and was slow to rise; that she had range of motion deficits in the neck, lower back, shoulders, knees, and hips; that she had tenderness to palpation and range of motion in both shoulders and knees; but she had no obvious joint swelling or instability; that she had 4/5 muscle strength and tone in all extremities and 4/5 grip strength bilaterally; that her fine and gross dexterity was preserved; that she had dullness to sensation in her lateral lower extremities; and that she had a flat affect and depressed mood.  (AR 349).  Dr. Bacchus opined that Hawkins had a history of degenerative disc disease in her lumbosacral spine, status post lumbar fusion in 2008; failed back syndrome with continued chronic lower back pain and sciatica; obesity; untreated depression; bilateral shoulder tendonitis; and tobacco abuse.  (AR 349-50).  Dr. Bacchus opined that Hawkins did "appear to have chronic low back pain with limitations in regards to repetitive bending, twisting, turning, lifting, climbing, and walking on uneven ground."  (AR 350).  He recommended that the agency obtain a mental health evaluation.  (AR 350).

Dr. Joshua Eskonen completed a physical residual functional capacity ("RFC") assessment on November 10, 2011, after reviewing the record.  (AR 352-59).  Dr. Eskonen

opined that Hawkins could frequently lift and carry 10 pounds; could stand and/or walk for at least two hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; could push and pull without limitation; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; had no manipulative, visual, or communicative limitations; and should avoid dangerous terrain and unprotected heights. (AR 353-56). Dr. J. Sands later reviewed the record and affirmed the opinion of Dr. Eskonen. (AR 439).

On November 13, 2011, Hawkins reported to the emergency room at Parkview Hospital, complaining of chest pain. (AR 360). Dr. Katherine Cassidy observed that Hawkins was awake, had a calm affect, and was oriented and speaking coherently. (AR 360). Hawkins described her chest pain as "stabbing" and radiating into her left arm. (AR 360). On examination, Dr. Cassidy found that Hawkins's systems were all normal, including her head, neck, cardiovascular, respiratory, back, neurological, and psychological systems. (AR 361). After an EKG was completed and Hawkins had continuous cardiac monitoring, she was discharged from the hospital with a prescription for Vicodin, Prednisone, and a Z-Pak. (AR 363). Hawkins was directed to followup with her primary care physician in a few days. (AR 363-64).

Hawkins underwent a mental status examination at the request of Social Security with Kenneth Bundza, Ph.D., on November 17, 2011. (AR 410-13). Hawkins reported to Dr. Bundza that her physical health problems and depression combine to cause her disability. (AR 410). She informed Dr. Bundza that her depression began in 1999, when her only child was killed in a car accident. (AR 410). Hawkins reported that she had frequent crying; problems sleeping; poor

appetite; isolation; anhedonia and irritability; a history of suicidal ideation but no plan; and periodic auditory hallucinations. (AR 410). Hawkins indicated that her depression had improved but had relapsed after her back injury and related problems in 2008. (AR 410-11). Dr. Bundza noted that Hawkins was alert and oriented; knew the correct month and year but not the specific date; knew the current and past Presidents of the United States; knew the mayor of Fort Wayne and the governor of Indiana; had intact long-term memory; was able to provide a reasonably detailed description of her activities on the previous day; was able to recall four digits forward and four digits backward; demonstrated adequate arithmetic skills, with the exception of multiplication; was able to complete serial sevens without errors; and did not demonstrate any significant deficits in common sense, general knowledge, or verbal abstract reasoning ability. (AR 412). Dr. Bundza concluded that Hawkins did not have any marked cognitive or intellectual impairment; was functioning in the low average range of intelligence; and was capable of managing her own funds. (AR 413). Dr. Bundza diagnosed Hawkins with major depressive disorder, recurrent, severe with psychotic features. (AR 413). He assigned Hawkins a Global Assessment of Functioning ("GAF") score of 50.[4] (AR 413).

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*. A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id*.

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am.

On November 23, 2011, Kari Kennedy, Psy.D., completed a psychiatric review technique after reviewing Hawkins's record. (AR 395-408). Dr. Kennedy found that Hawkins had a medically determinable impairment, specifically major depressive disorder, recurrent and severe with psychotic features. (AR 398). As a result, Dr. Kennedy opined that Hawkins had mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace; Dr. Kennedy found that Hawkins did not have any episodes of decompensation of extended duration, however. (AR 405). Dr. Kennedy noted that Hawkins had not obtained mental health counseling, had not had any psychiatric hospitalizations, and had no prescription psychiatric medications. (AR 407). Dr. Kennedy further noted that Hawkins lived alone, performed her own self-care with some physical limitations, did not need reminders to take care of her personal hygiene or to take medications, could prepare simple meals and complete limited household tasks, went out alone, drove, shopped, could manage finances, got along with others including authority figures, could follow written and spoken instructions, and was able to concentrate. (AR 407). Dr. Kennedy found Hawkins to be partially credible, but found that her impairment of depression was not severe. (AR 407). Donna Unversaw, Ph.D., later reviewed Hawkins's record and affirmed the opinion of Dr. Kennedy. (AR 440).

On January 8, 2012, Hawkins went to the emergency room at Parkview Hospital complaining of chest pain and shortness of breath. (AR 414). Dr. Gerry Easterday and James Chapman, a physician's assistant, assessed Hawkins in the emergency room and observed that

Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Hawkins, so they are relevant to the ALJ's decision. *See id*. (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

she was awake, alert, and cooperative, with an affect that was calm and appropriate. (AR 414). Mr. Chapman performed a physical exam of Hawkins, finding that all systems were normal, other than Hawkins's chest, which was very tender on the left side to even mild palpation. (AR 415). After continuous cardiac monitoring, as well as the taking of two chest images, Hawkins was discharged from the emergency room with prescriptions for Vicodin and Naprosyn as well as instruction to follow up with her primary care physician. (AR 416-17).

Hawkins returned to the Matthew 25 Clinic on February 28, 2012, for a followup appointment regarding her hypothyroidism. (AR 427). At the appointment, Hawkins and her healthcare provider discussed her recent visit to the emergency room. (AR 427-28). Hawkins had continued complaints of chest pain, but noted that "Vicodin & Naproxen work good together." (AR 428). Hawkins also complained about her insomnia and fatigue, as well as shoulder pain. (AR 428). Hawkins reported that she felt depressed and sad. (AR 428). Her healthcare provider referred her for counseling services as well as to the ortho clinic regarding her shoulder pain. (AR 428).

On April 2, 2012, Hawkins underwent X-rays of her right knee, left knee, and lumbar spine at the request of Social Security. (AR 436-38). Dr. John Pasalich reviewed the images and found that Hawkins had minimal tricompartmental degenerative osteophytes as to her right knee, minimal degenerative change as to her left knee, and that the images of her lumbar spine showed a satisfactory post fusion radiograph. (AR 437-48).

On April 10, 2012, Hawkins attended another appointment at the Matthew 25 Clinic. (AR 562). Hawkins complained of depression and insomnia, and her provider referred her to Park Center. (AR 562).

On May 15, 2012, Hawkins underwent an MRI of her left shoulder at Parkview Health. (AR 441-42). The MRI showed a stable chondral lesion of the humeral head, with tendinopathy of the superior fibers of the subscapularis tendon and supraspinatus tendon and mild degenerative changes of the acromioclavicular joint. (AR 441). It was noted that there were no acute findings, and the lesion was stable, as the scan was consistent with the previous images dating back to 2003, and had only "mildly progressed" since March 2006. (AR 441-42).

On May 16, 2012, Hawkins attended an appointment at the Matthew 25 Clinic. (AR 559). She reported complaints of insomnia and hypothyroidism, and stated that Benadryl causes her a "hangover." (AR 559). Hawkins returned to the Matthew 25 Clinic for a followup appointment on June 19, 2012, and she complained of shoulder pain as well as sadness and fatigue. (AR 553). Her provider assessed depression and referred Hawkins for counseling. (AR 554). Regarding her shoulder pain, Hawkins's provider indicated that Hawkins had been instructed during physical therapy to exercise and ice her shoulder. (AR 554).

On June 21, 2012, Hawkins presented to Park Center for an initial assessment with Julie Godsey, a licensed counselor. (AR 487). Ms. Godsey diagnosed Hawkins with major depressive disorder, recurrent and moderate, as well as PTSD. (AR 487). Ms. Godsey assigned Hawkins a GAF score of 57. (AR 487). Hawkins attended another appointment with Ms. Godsey at Park Center on July 12, 2012. (AR 472).

Hawkins returned to the Matthew 25 Clinic for a followup appointment on August 15, 2012. (AR 551). Hawkins reported that she had been getting "much better sleep," and that the "Trazodone is helping." (AR 551).

On August 29, 2012, Hawkins had another counseling appointment at Park Center, this

time with Karen Lothamer, a clinical nurse specialist. (AR 461-64). Ms. Lothamer diagnosed Hawkins with major depressive disorder, recurrent and moderate, as well as PTSD, and assigned Hawkins a GAF score of 57. (AR 463). Ms. Lothamer prescribed Hawkins Prozac and Remeron to begin her treatment. (AR 463).

Hawkins went to the emergency room at Parkview Hospital on September 28, 2012, complaining of pain in her lower back that was radiating to her thighs. (AR 443). Hawkins informed Elaine Kruse, a physician's assistant, that her pain was usually well managed with naproxen but was a 10 on a 10-point scale that day, so she had taken two Vicodin 5 mg tablets but had not had any relief. (AR 443). Ms. Kruse performed a physical exam of Hawkins, noting that she appeared to be uncomfortable and was crying; she occasionally flinched and winced in pain for about 10-15 seconds before improving; her surgical scar from her previous surgery was well-healed; she was "acutely tender" and pulled Ms. Kruse's hand away from palpation around the L5-S1 area; she had mild right-sided paravertebral musculature tenderness and no CVA tenderness bilaterally; she could perform straight leg raises to about 30 degrees bilaterally; there was no saddle anesthesia to palpation; and her strength was +5 and symmetric bilaterally to dorsiflexion plantar flexion. (AR 444). Three X-rays were taken of her lumbar spine, which showed no evidence of hardware complication and no acute abnormality. (AR 448). Hawkins was discharged from the emergency room after being prescribed Vicodin, Valium, and Prednisone. (AR 445-46).

On October 4, 2012, Hawkins placed a phone call to Park Center, and she spoke with Letisia Weaver, a licensed practical nurse and social worker. (AR 459-60). Hawkins reported to

Ms. Weaver that she did not have insurance; Hawkins had seen her friend shot in front of her a few days before, and she had only slept four hours over the last four days. (AR 459). Hawkins stated that her mind was racing and she could not "turn it off." (AR 459). Ms. Weaver reviewed this with Ms. Lothamer, who prescribed Silenor for Hawkins. (AR 460). Ms. Weaver provided medication education to Hawkins. (AR 460).

Hawkins was seen by Ms. Lothamer at Park Center on October 22, 2012. (AR 453-58). Hawkins reported that she had recently had to move and also had some car problems, but her focus was on the trauma she witnessed when her friend was shot. (AR 453). Ms. Lothamer wrote that Hawkins was not having thoughts of self-harm and did not have any self-harm behavior; she was not having sleep problems or appetite problems; she was not abusing any substances; her appearance was appropriate, and she had a cooperative but detached attitude; her behavior was distractible; she had normal speech and coherent thought form; she had a flat affect; she was awake, alert, and oriented; her mood was depressed and anxious; her thought content and perception were normal; she had no suicidal or homicidal ideations; she had no problems with her memory; she admitted to her illness and need for treatment; and she had good and appropriate judgment. (AR 453-55). Ms. Lothamer also documented that Hawkins had been fully compliant with her medication, which had not caused her any side effects. (AR 455). Ms. Lothamer assessed Hawkins as being worse than she had been previously, and continued Hawkins's previous medications and added Fanapt as a new medication. (AR 456). Ms. Lothamer directed Hawkins to return in three months for a followup appointment. (AR 458).

On April 19, 2013, Hawkins went to the emergency room at Parkview Hospital,

complaining of pain in her right arm/shoulder and her low back. (AR 490). Hawkins informed Dr. Gregg Pollander that she was treated with nonsteroidals at the Matthew 25 Clinic, but she would like something stronger for her pain. (AR 490). Dr. Pollander performed a physical examination of Hawkins, and he indicated that she was in "no obvious distress" and appeared to be "generally comfortable" unless she moved around in her bed; her head, ears, nose, throat, neck, cardiovascular, chest, abdomen, vascular, back, neuro, skin, and psychological systems were normal; she had no calf swelling or tenderness and no swelling of the extremities; she had pain with range of motion in her right shoulder, but not deformity, erythema, or swelling; she had tenderness out of proportion to the skin over her back inconsistently diffusely and of her right shoulder, which Dr. Pollander did not believe represented infection or acute injury. (AR 491-92). Dr. Pollander stated that Hawkins seemed to have lumbar and shoulder strain. (AR 492). He did not think that any imaging studies were necessary, and he discharged her with pain medication and directions to followup with the Matthew 25 Clinic. (AR 492).

On May 13, 2013, Ms. Lothamer and Dr. Larry Lambertson, together with other providers at Park Center, prepared a treatment plan for Hawkins. (AR 449-52). The diagnosis remained the same: major depressive disorder, recurrent and moderate; PTSD; and a GAF score of 57. (AR 449). It was documented that Hawkins had not returned a phone call from Park Center. (AR 450). The treatment plan stated that Hawkins had reported continued difficulty sleeping, both insomnia and nightmares, which had been addressed by adjustments to her medication. (AR 451). It was noted that Hawkins's next appointment was scheduled for July 2, 2013, at which time she electronically signed the treatment plan. (AR 451).

On August 20, 2013, Ms. Lothamer and Dr. Lambertson completed a "Mental Source Statement," after indicating that they had reviewed Dr. Bundza's mental status exam as well as Hawkins's records at Park Center. (AR 564-67). Ms. Lothamer and Dr. Lambertson opined that Hawkins's mental illness would cause her to be absent from work due to poor sleep. (AR 566). They further opined that if Hawkins were working on a full-time basis, she would miss more than three days per month due to mental illness and would only be able to remain on task for 70% to 75% of the day. (AR 566).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial

evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Id*.

## IV.  ANALYSIS

### *A.  The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Hawkins is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 404.945(a)(5), 416.920(e), 416.945(a)(5).

or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. The ALJ's Decision

On December 18, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 21-35). At step one, the ALJ found that Hawkins had not engaged in substantial gainful activity since her amended alleged onset date of December 31, 2009. (AR 23). At step two, the ALJ found that Hawkins had the following severe impairments: minimal tricompartmental degenerative osteophytes of the right knee; minimal degenerative changes in the left knee; stable chondral lesion of the left humeral head with tendinopathy and mild degenerative changes of the left acromioclavicular joint; mild obstructive sleep apnea; insomnia; hypothyroidism; obesity; and lumbar degenerative disc disease, status-post surgery. (AR 24). At step three, the ALJ found that Hawkins did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 28).

Before proceeding to step four, the ALJ determined that Hawkins had "the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)." (AR 28). At step four, the ALJ considered this RFC and the VE's testimony before finding that Hawkins could not perform her past relevant work. (AR 34). The ALJ then concluded at step five that Hawkins was not disabled under Medical-Vocational Rule 201.21

because she could perform the full range of sedentary work.  (AR 34-35).  Accordingly, the ALJ

determined that Hawkins was not disabled from December 31, 2009, the alleged onset date,

through December 18, 2013, the date of the ALJ's decision; Hawkins's claims for DIB and SSI

were therefore denied.  (AR 35).

### C.  The ALJ's Evaluation of the Opinion of Ms. Lothamer and Dr. Lambertson

The first issue to be addressed is the ALJ's evaluation of the opinion of Ms. Lothamer

and Dr. Lambertson, Hawkins's treating mental healthcare providers at Park Center.  "A treating

physician's opinion that is consistent with the record is generally entitled to 'controlling

weight.'"  *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 20 C.F.R. §

404.1527(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)).  In other words, the ALJ

must give a treating physician's opinion controlling weight if:  (1) the opinion is supported by

"medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not

inconsistent" with substantial evidence of record.  *Schaaf*, 602 F.3d at 875.

The Social Security Administration has clarified what factors should be considered when

determining the weight to be given to a medical opinion in 20 C.F.R. §§ 404.1527(c) and

416.927(c).  The factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the

treatment relationship and the frequency of examination, the nature and extent of the treatment

relationship, supportability, consistency, specialization, and other factors such as the familiarity

of a medical source with the case.  20 C.F.R. §§ 404.1527(c), 416.927(c).  "[I]f the treating

source's opinion passes muster under [§§ 404.1527(c)(2) and 416.927(c)(2)], then there is no

basis on which the administrative law judge, who is not a physician, could refuse to accept it."

24

*Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist the patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives "good reasons." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875. The ALJ cannot pick and choose the evidence that favors his final decision; rather, the ALJ must articulate his analysis well enough for an appellate court to follow and review his reasoning. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).

Here, the ALJ failed to adequately explain his reasons for disregarding the opinion of Ms. Lothamer and Dr. Lambertson, Hawkins's treating mental healthcare providers. By omitting several key aspects of the opinion from his discussion, the ALJ failed to build an accurate and logical bridge from the evidence to his decision to give little weight to the opinion of Ms. Lothamer and Dr. Lambertson.

Ms. Lothamer and Dr. Lambertson of Park Center completed their "Mental Source Statement" on August 20, 2013, and they noted that they had seen Hawkins from August 29, 2012, through July 2, 2013, a time period just short of one year. (AR 564-67). In the statement, Ms. Lothamer and Dr. Lambertson opined that Hawkins would miss more than three days per month if she were working full time, due to her poor sleep. (AR 566). Ms. Lothamer and Dr. Lambertson further opined that Hawkins would be able to sustain unskilled work for only 70% to

75% of the workday. (AR 566). As the basis for their opinions regarding Hawkins's absenteeism, attention, and concentration, Ms. Lothamer and Dr. Lambertson listed that Hawkins had a sullen, flat, and tearful mood; depressed and anxious behavior; and had reported poor sleep, including auditory hallucinations of a baby crying. (AR 564). Ms. Lothamer and Dr. Lambertson stated that Hawkins had depressive episodes beginning in 1999 and recurring in 2006 and 2012. (AR 565). The opinion noted that Hawkins had anxiety attacks three or four times per month, for which she had gone to the emergency room. (AR 565). Ms. Lothamer and Dr. Lambertson explained that Hawkins's auditory hallucinations may be related to her PTSD. (AR 565). As a result, Ms. Lothamer and Dr. Lambertson opined that Hawkins's mental illness was severe enough that it would cause her to be absent from work, without including any problems related to substance abuse. (AR 566).

The ALJ did not discuss the signs and symptoms listed by Ms. Lothamer and Dr. Lambertson as supporting their opinion, the three depressive episodes, the anxiety attacks, or Hawkins's auditory hallucinations. Instead, at step two of his decision, the ALJ wrote the following in his discussion of the treatment Hawkins had received at Park Center, as well as the opinion issued by Ms. Lothamer and Dr. Lambertson:

> The claimant received some sporadic mental health treatment at Park Center between June 2012 and May 2013. According to such progress notes, she was diagnosed with major depressive disorder and posttraumatic stress disorder, and was assessed with a GAF score of 57, which indicates moderate limitations in social, occupational, and school functioning. However, the undersigned affords little weight to the GAF score, because other clinical findings suggest that the claimant's mental impairments cause no more than mild limitations, other than during brief periods of

exacerbation. While considered, it is noted the claimant only attended one appointment in June, two in July, one appointment in August, two in October, and one appointment in May 2013. This level of treatment does not persuasively argue for disabling impairment related limitations. For example, when medicated properly with Remeron and Prozac, she presented to appointments with an appropriate appearance. Her insight, judgment, speech and thought content were normal. She was alert and fully oriented. The claimant held jobs for reasonable periods of time, she had no trouble managing her finances, she is able to access and use community resources, and there was no evidence she was a danger to herself or others. She denied sexual aggression, homicidal/suicidal thoughts, hallucinations, delusions, or obsessions (Ex. 15F). Such treatment notes also indicate misuse or inconsistent use of medications resulting in instability of underlying medical conditions. (15F, pp. 17, 36). Matthew 25 medical treatment records also fail to document ongoing objective medical findings of significant deficits in mental, emotional or cognitive functioning despite treatment.

Despite the clinical findings that suggest that the claimant's functionality was significantly improved with medication, K. Lothamer, MSN, and L. Lambertson, Ph.D., of the Park Center suggested the claimant's symptoms would cause her to miss work more than three days a month, and that she could only remain on task for 70-75% per work hour (Ex. 23F). These opinions are given very little weight because the claimant's mental health treatment has been sporadic and because there is little persuasive evidence that indicates that the claimant's mental impairments would preclude her from engaging in substantial gainful activity on a regular and sustained basis.

The claimant also received general care at the Matthew 25 Clinic for her insomnia and fatigue, but there is no indication that the claimant had severe mental work-related restrictions or significant mental symptoms of more than brief duration from her amended alleged onset date through the present date. If the claimant's mental impairments were as severe as alleged, it seems likely her primary care physician would have noted his patient had depressive symptoms or impaired mood (Exs. 9F, 21F, & 22F).

(AR 24-25).  The ALJ then gave "great weight" to the opinions of the state agency psychological consultants, who "opined that the claimant's mental impairments caused no more than mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace," because the ALJ found that the opinions of the state agency psychological consultants were "consistent with the clinical findings, and the claimant's functioning described below in the Part B analysis."  (AR 26).

The ALJ's discussion of the opinion issued by Ms. Lothamer and Dr. Lambertson presents many problems.  First, the ALJ did not discuss the stated basis for the opinion, but rather concluded without explanation that "there is little persuasive evidence that indicates that the claimant's mental impairments would preclude her from engaging in substantial gainful activity on a regular and sustained basis."  (AR 25).  This does not qualify as the "good reasons" required by the regulations to discount a treating physician's opinion, particularly because the ALJ discussed only a small portion of the opinion rather than considering the four-page opinion as a whole.  *See Campbell*, 627 F.3d at 306-07 (finding that the ALJ's minimal reasons for discounting the opinion did not qualify as "good reasons" and noting that "[a]n ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability").

Furthermore, the ALJ appears to have impermissibly "cherry-picked" the evidence relevant to Hawkins's mental health.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a

disability finding.").  For example, the ALJ stated in his decision that Hawkins's treatment notes

at Park Center showed that "there is no evidence of danger to self or others."  (AR 25 (citing Ex.

15F)).  The same pages of those records note that while "[t]here is no evidence of any forms of

intentional self-injury," Hawkins "has a history of reckless and risk-taking behavior that may

endanger [herself]," and further noted that Hawkins had "report[ed] that she has fleeting thoughts

and feels that she wants to die."  (AR 485).  Other portions of the records also contradict the

ALJ's statement that "there is no evidence of danger to self or others."  (*See* AR 462 ("The client

presents with suicidal ideas.  The client presents with violence."), AR 480 ("suicidal ideations

fleeting with no attempt")).  Additionally, while the ALJ included in his opinion that Hawkins

"presented to appointments with an appropriate appearance" when "medicated properly" (AR

25), the ALJ neglected to mention treatment notes stating that Hawkins "has difficulty with

personal self-care, bathing, showering, or brushing teeth," and "caring for [her] general

appearance (hair, hands, make-up, and shaving)," and did not include in his discussion any

mention to her provider's statement that "[a] moderate degree of self-care impairment is

evidenced."  (AR 485).  Furthermore, the ALJ stated that Hawkins had denied hallucinations (AR

25), when the record contradicts this.  (*See* AR 410, 462, 564).  Finally, the ALJ never discusses

that Hawkins had frequently reported having nightmares, flashbacks, and panic attacks, which

supported her diagnosis of PTSD.  (AR 453, 462, 480).  From these examples, it is clear that the

ALJ did not properly evaluate the opinion of Ms. Lothamer and Dr. Lambertson, as the ALJ

"may not selectively consider medical reports, especially those of treating physicians, but must

consider 'all relevant evidence.'"  *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (citations

omitted); *see also Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits.").

Additionally, the ALJ discounted the opinion and the severity of Hawkins's mental impairments—and the opinion of Ms. Lothamer and Dr. Lambertson—because of a few notes in Hawkins's treatment records that she had trouble consistently taking her medications, and her provider noted that she might benefit from direct supervision of medication. Specifically, the ALJ emphasized that Hawkins did better overall when medicated properly, and he stated that her "treatment notes also indicate misuse or inconsistent use of medications resulting in instability of underlying medical conditions." (AR 25 (citing AR 465, 484)). The Seventh Circuit has cautioned ALJs from placing too much emphasis on the non-compliance of a mentally-impaired claimant in taking medications, as the claimant's non-compliance is likely caused by the mental illness. *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (stating that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently"). Here, the ALJ does not consider the fact that Hawkins's difficulty in consistently taking medications is likely itself a symptom of her mental illness.

Another issue arises with the ALJ's discounting of Hawkins's mental impairments because he found that they were not supported by her treatment notes from the Matthew 25 Clinic, writing that, "[i]f the claimant's mental impairments were as severe as alleged, it seems likely her primary care physician would have noted his patient had depressive symptoms or impaired mood." (AR 25 (citing Exs. 9F, 21F, & 22F)). In fact, Hawkins's treatment notes from the Matthew 25 Clinic do include multiple references to Hawkins's depression. (*See* AR 428

(noting that Hawkins was "sad" and "feels depressed"), 553 (noting that Hawkins was sad, had

fatigue, kept to herself, and had decreased motivation), 554 (her provider assessed her with

depression and referred her for counseling), 561-62 (Hawkins attended a followup appointment

regarding her depression, insomnia, and shoulder pain, and she was again referred for

counseling)).  Thus, the ALJ appears to have discounted Hawkins's mental impairments and the

opinion of Ms. Lothamer and Dr. Lambertson based on a factually incorrect reason.

Finally, the ALJ gave "great weight" to the opinions of the state agency psychological

consultants, Dr. Kennedy and Dr. Unversaw.  (AR 26).  Dr. Kennedy's psychiatric review

technique, which was affirmed by Dr. Unversaw, opined that Hawkins had major depressive

disorder, recurrent and severe with psychotic features.  (AR 398, 407).  However, the state

agency psychological consultants opined that her depression was not severe because she "was not

engaged in [mental health] counseling, there are no apparent periods of decompensation, there

are no psych[iatric medications prescribed]," and her activities of daily living did not indicate a

severe impairment.  (AR 407).  While the ALJ gave "great weight" to these opinions, the ALJ

did not explain why the state agency opinions from non-examining consultants—which were

issued on November 23, 2011 (AR 395), and affirmed on April 9, 2012 (AR 440)—should

receive greater weight than the opinion of her treating mental health care providers, which was

issued on August 20, 2013 (AR 564-67), one and a half to two years after the state agency

opinions.  *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("In any event, the ALJ would

be hard-pressed to justify casing aside [the treating psychiatrist's] opinion in favor of these

earlier state agency opinions . . . [which] were two years old [by the time the ALJ held a

31

hearing].").

Further amplifying this problem is the fact that all of Hawkins's mental health treatment at Park Center occurred after both of the state agency psychological consultants reviewed the record and issued their opinions. The opinion of Ms. Lothamer and Dr. Lambertson was "the most recent professional word on [Hawkins's] mental impairments," and was issued by her treating psychiatric nurse and the supervising psychiatrist, who issued the opinion after a review of the record; thus, "[n]o other medical opinion available to the ALJ provided a similarly comprehensive picture of [Hawkins's] overall mental health at the time of the hearing." *Id.; see also Coppage v. Colvin*, No. 2:13-CV-405-PRC, 2015 WL 1243321, at *12 (N.D. Ind. Mar. 17, 2015) (remanding the case and noting that "the significant weight the ALJ gave to the consultative reviewers' opinions is suspect in light of the time that elapsed between their June and July 2011 opinions and the August 2012 hearing given the intervening medical records, the subsequent treating physician opinions, and Plaintiff's testimony").

Indeed, the impropriety of this decision by the ALJ—to give great weight to the state agency opinions and very little weight to the opinion of Hawkins's treating psychiatric nurse and supervising psychiatrist—should have been obvious, given that the state agency physicians' reasoning for finding Hawkins's mental impairments non-severe was based partly on the fact that she was not receiving mental health counseling and had not been prescribed psychiatric medication. (AR 407). When Hawkins began mental health treatment at Park Center, where she received both counseling and psychiatric medications, it should have been clear to the ALJ that he could no longer rely on the opinions of state agency psychological consultants who reviewed the record prior to Hawkins's mental health treatment. *See Buechele v. Colvin*, No. 11 C 4348,

2013 WL 1200611, at *12 (N.D. Ill. Mar. 25, 2013) (collecting cases that remanded because the ALJ relied upon state agency physicians' opinions that were not based on a complete review or accurate summary of all the relevant medical evidence).

To conclude, the ALJ's evaluation of the opinion of Ms. Lothamer and Dr. Lambertson requires remand, given the ALJ's lack of "good reasons" for giving the opinion less than controlling weight, the ALJ's cherry-picking of the evidence, the ALJ's improper consideration of Hawkins's difficulties in consistently taking her medication to discount the severity of her mental illness, the ALJ's incorrect statement regarding her Matthew 25 Clinic treatment records, as well as the ALJ's questionable decision to give great weight to the state agency reviewing psychologists whose review preceded the entirety of Hawkins's mental health treatment. *See Ivey v. Astrue*, No. 2:11-CV-83, 2012 WL 951481, at *13 (N.D. Ind. Mar. 20, 2012) (recognizing that an ALJ's decision to give more weight to a reviewing state agency physician's opinion "cannot stand where it lacks evidentiary support and is based on an inadequate review of [the claimant's] subsequent medical record").

### D. Hawkins's Remaining Arguments for Remand

Hawkins makes three additional arguments in favor of remand:  (1) that the ALJ improperly evaluated the opinion of the examining state agency psychologist, Dr. Bundza; (2) that the ALJ improperly evaluated the credibility of Hawkins's symptom testimony at the hearing; and (3) that the ALJ improperly found that Hawkins did not meet the durational requirements for a severe mental impairment at step two.  Because remand is necessary in this case as discussed above, in order to permit the ALJ to properly evaluate the opinion of Ms. Lothamer and Dr. Lambertson, the Court need not provide an in-depth analysis of Hawkins's

remaining arguments. However, because other errors in the ALJ's decision are evident, the Court will briefly discuss these problems so that the ALJ can correct these errors as well upon remand.

First, the Court will address the ALJ's evaluation of the opinion of Dr. Bundza, who opined that Hawkins's primary diagnosis was major depressive disorder, severe with some psychotic features. (AR 413). Dr. Bundza stated that Hawkins's "prognosis for significant improvement in the near future is guarded to poor." (AR 413). Dr. Bundza also assigned Hawkins a GAF score of 50, which indicates serious limitations in social, occupational, and school functioning. (AR 24, 413). While the ALJ considered Dr. Bundza's opinion, and gave "very little weight" to the GAF score, the ALJ never stated what weight he assigned to Dr. Bundza's opinion as a whole. (AR 24). Given that Dr. Bundza's opinion was favorable to Hawkins being found disabled, or at least in finding that her depression was a severe impairment meeting the duration requirements, the ALJ's failure to specify the weight he gave Dr. Bundza's opinion prevents the Court from conducting a meaningful review of the ALJ's decision. *See Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) (finding that the ALJ failed to build an accurate and logical bridge between the mental evidence and the RFC where the ALJ failed to provide a determination of the weight assigned to medical opinions, which prevented the court from determining the significance of the opinions); *Clifford*, 227 F.3d at 874 ("For meaningful appellate review, however, we must be able to trace the ALJ's path of reasoning.").

Turning next to Hawkins's arguments regarding the ALJ's evaluation of her credibility, the Court agrees that the ALJ "played doctor" by discounting the credibility of Hawkins's symptom testimony without citing to any basis in the medical opinions. Specifically, the ALJ

34

wrote that, regarding Hawkins's "alleged inability to stand for only four to six minutes, the medical records do not document the presence of long term and significant atrophy or loss of muscle tone, which might be expected after nearly four years of almost complete inability to stand for any length of time."  (AR 30).  The ALJ did not explain the basis for his expectation that Hawkins would have such atrophy or loss of muscle tone, and the opinions of the examining and reviewing state agency physicians do not include such an expectation.  (AR 30, 347-51; 352-59; 439).  "ALJs are required to rely on expert opinions instead of determining the significant of particular medical findings themselves."  *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (citing *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) ("[T]he ALJ seems to have succumbed to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was inconsistent with a diagnosis of mental retardation because no expert offered evidence to that effect here."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")).  Here, the ALJ's statements regarding Hawkins not having the type of atrophy or muscle loss that would be expected if her symptoms were as severe as she claimed is unsupported by the medical opinions in the record and thus appears to be an instance of the ALJ "playing doctor."

The Court will now turn to Hawkins's last argument regarding the ALJ's step-two finding that her depression and PTSD did not meet the durational requirements for a severe mental impairment.  At step two, the ALJ found a list of Hawkins's physical impairments to be severe, but he did not find her major depressive disorder and PTSD to be severe impairments for purposes of step two because "there is no showing that they have been or will be severe for 12 or

more consecutive months and do not, therefore, meet the durational requirement . . . ." (AR 24). The "step two determination of severity is 'merely a threshold requirement,'" because "as long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015) (quoting *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010)). "Thus, as long as the ALJ finds at least one severe impairment, continues his analysis, and considers a Plaintiff's non-severe impairments at the later steps of his determination, a court need not remand a case to correct a step two error." *Jacoby v. Colvin*, No. 1:15-cv-02001-SEB-MJD, 2016 WL 6603259, at *3 (S.D. Ind. Oct. 11, 2016) (citing *Castile*, 617 F.3d at 927; *Curvin*, 778 F.3d at 648).

As a result, the ALJ's failure to include Hawkins's depression and PTSD as severe impairments at step two "is of no legal consequence," because the ALJ found at least one impairment to be severe and continued with the sequential analysis. *Id.* (citations omitted). Instead, the question before the Court is whether the ALJ properly considered the cumulative effect of Hawkins's impairments, both severe and non-severe, in the subsequent steps of the decision. *Id.* (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)). Here, the remainder of the ALJ's decision does not discuss the cumulative effect of Hawkins's depression and PTSD together with the severe physical impairments when determining whether Hawkins met a Listing at step three or when determining Hawkins's RFC. (AR 28-34). Thus, it appears that the ALJ erred by failing to properly consider her depression and PTSD along with her severe impairments when proceeding in the sequential process. *See Golembiewski*, 322 F.3d at 918 (remanding and instructing the ALJ to "consider the *aggregate* effect of this entire constellation of ailments—including those impairments that in isolation are not severe").

36

### V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Hawkins and against the Commissioner.

SO ORDERED.

Entered this 30th day of March 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge